# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 2:22-cr-121 |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM IN AID OF** |
| ) | **SENTENCING** |
| OMARI PATTON, ) | |
| ) | |
| Defendant. ) | |

COMES NOW, the defendant, OMARI PATTON, by and through counsel, and files the following Memorandum In Aid of Sentencing. In support thereof, the defendant provides the following:

## **INTRODUCTION**

The Iraq war. Facebook. Twitter. Instagram. iPhones. iPads. Phone cameras. Skype, Teams and Zoom. Streaming services. Amazon Prime. Uber. A housing crisis. The first black President. American Idol. Wiz Khalifa. Consol Energy Center. PPG Paints Arena. Sidney Crosby drafted. Mario Lemieux retired. Three Stanley Cup Championships. Ben Roethlisberger drafted. Ben Roethlisberger retired. Mike Tomlin hired. Jerome Bettis retired. Super Bowl XL. Super Bowl XLIII.

This list is just a small-but-notable sample of things that did not exist or events that had not yet occurred the last time Omari Patton breathed the fresh air of freedom. April 18, 2002.

Omari Patton (hereinafter "Omari") was arrested on April 18, 2002 for having conspired to distribute controlled substances. He was convicted at trial and sentenced to thirty years' in prison, where he has been ever since.

In the beginning of 2019, a grand jury returned an indictment against Omari, alleging he conspired to distribute synthetic cannabinoids while incarcerated at FCI Fort Dix (hereinafter "the conspiracy case"). He and his son, his co-defendant, were acquitted. Approximately two months later, the government had Omari re-charged with attempting to provide or obtain contraband while at FCI Fort Dix (hereinafter "the contraband case"). Omari was convicted at trial on the contraband case. He is scheduled to be sentenced on June 15, 2023.

When Omari was charged in the conspiracy case (January 2019), he was transferred out of the BOP to the CoreCivic Northeast Ohio Corrections Center, Youngstown, Ohio (hereinafter "NEOCC") as he awaited trial. Eventually, all federal inmates on U.S. Marshals' hold at NEOCC were relocated to "public prisons," and, for Omari, that meant a transfer to the Allegheny County Jail (hereinafter "ACJ") in or around late 2020/early 2021, where he remained until trial.

After being acquitted in the conspiracy case in March 2022, Omari returned to the BOP, specifically FCI Fort Dix, where he awaited release to community confinement which was projected for June 2022. When he was re-indicted in May 2022 for the contraband case, he was, again, relocated back to NEOCC where he has remained ever since.

On January 10, 2023, the Honorable Nicholas Ranjan, who had presided over the conspiracy case and "inherited" Omari's original/2002 case, granted compassionate release on the basis of Omari's lengthy prison stint and serious health conditions. Accordingly, Omari has been held since that time solely on the contraband case.

By way of this memorandum, the defense respectfully seeks imposition of a sentence that will reunite Omari with his family – a variance to a non-custodial sentence. The justification for the variance are set forth, *infra*.

# **FACTORS TO BE CONSIDERED**

The court must craft a sentence sufficient, *but not greater than necessary* to achieve the goals of sentencing as set forth in 18 U.S.C. § 3553(a)(2). Although the Court must calculate the defendant's offense level and criminal history category, and consider the Sentencing Guidelines, the resulting Guideline range is advisory, not mandatory. *U.S. v. Booker*, 543 U.S. 220 (2005). In determining the sentence that is both sufficient and not greater than necessary, the Court is guided to the factors set forth in 18 U.S.C. § 3553(a).

**(1) The nature and circumstances of the offense and the history and characteristics of the defendant.**

**a. Nature and Circumstances of the Offense**

All federal crimes are serious offenses warranting serious consequences. The counts of which Mr. Patton has been convicted are no exception. As with any situation, however, some context is also important and the defense believes there is substantial mitigation surrounding the crimes of conviction for the Court to consider – particularly since much of it was presented at the first trial, but not the current one.

The crux of the offenses at issue before the Court is that Omari and his friend, Shamar Banks, attempted to acquire synthetic cannabinoids (a/k/a "K2") while in jail. K2 is a relatively new drug concept. According to the DEA:

> Synthetic cannabinoids are not organic, but are chemical compounds created in a laboratory. Since 2009, law enforcement has encountered *hundreds* of different synthetic cannabinoids that are being sold as "legal" alternatives to marijuana …
>
> Synthetic cannabinoids are sold as "herbal incense" and "potpourri" under names like K2 and spice, as well as many other names, at small convenience stores, head shops, gas stations and via the Internet from both domestic and international sources.

*Department of Justice/Drug Enforcement Administration, Drug Fact Sheet*, K2/Spice, April 2020.

The American Addiction Centers notes, "Chemists are consistently attempting to skirt these regulations by changing the chemical compounds." *The Effects and Dangers of K2*, The American Addiction Centers, October 21, 2022. At the conspiracy trial, Detective Harpster testified that the four K2 "compounds" at issue were added to the controlled substance schedule at different times between April 2017 and July 2018. ECF 2:19-cr-8, Doc. 3387, pg. 27. On March 8, 2022, Det. Harpster also testified "…my focus in the last few years has been K2. *Prior to that, I hadn't seen it.*" ECF 2:19-cr-8, Doc. 3387, p. 30 (emphasis added).

Because this case has been around for nearly five years, it is tempting to view it in the context of now. K2 is, unfortunately, prevalent in jails and much is known about its effects and risks. But, at the time of the investigation, much less was known and the enforcement attitude about it at FCI Fort Dix was rather cavalier. Indeed, several of the K2 compounds had only been added to the controlled substance list within mere months of being interdicted by the BOP and the resulting charges. The novelty of this K2, relative to the investigation and indictment, separates this case from other narcotics or controlled substance contraband cases and, indeed, was why the jury acquitted Omari in the conspiracy case.

The defense has gone to great lengths in prior pleadings to articulate its objection to application of the §2D1.1 cross-reference at §2P1.2(c) of the contraband Guidelines and need not belabor that objection here. However, it is important to point out that, should the Court overrule the defendant's objections in this regard, the converted drug weight also substantially overstates the seriousness of the offense.

The government alleges that the converted drug weight totals 26.2 kilograms. PSR ¶A.15. During an administrative resolution conference call held on April 19, 2023, counsel for the United States alleged that this number came from 19 "sheets" of K2 paper.

4

This paper, however, is not typical copy paper. According to Det. Harpster, "They take -- just certain stocks of paper are better than others, so they'll take a heavier stock of paper, like a resume paper." ECF 2:19-cr-8, Doc. 3387, p. 13. The resume paper seized from DaShawn Burley's residence was 24-lb., 100% cotton paper. Per page, this paper weighs 5.4 grams. *See* https://www.midlandpaper.com/tools/m-weight/. At 19 sheets, of the seized contraband, 102.6 grams is attributable to the paper. When applied to the Guidelines converted drug weight calculator, this results in 17.1 kilograms of the 26.6-kilogram total consisting of the weight of the paper.

The defense acknowledges that decisional case law establishes that the drug weight calculation should include the weight of the paper since the paper was, in fact, consumed with the controlled substance. However, the Court should consider the disparity between the pure substance versus the substance plus the paper. "[T]he purity or diluteness of a drug mixture can be a relevant factor for determining whether a sentence is 'sufficient, but not greater than necessary' under § 3553(a)." *U.S. v. Stewart*, 761 F.3d 993, 1003 (9th Cir. 2014). If the total converted drug weight is 26.6 kilograms, then the actual amount of K2 utilized was 57.7 grams.[1] If 57.7 grams of actual K2 can create 19 sheets, then 160.3 grams would have the potential to create 52 sheets.[2] However, the Guidelines would not differentiate between a defendant caught with 160.3 grams of K2 powder and the defendant caught with 57.7 grams of powder applied to K2 papers, even though the defendant with the K2 powder would, by all objective measures, be in possession of a greater amount of a controlled substance.

---

[1] 17.1 ÷ 26.6 = .64; 102.6 ÷ .64 = 160.3 (total unconverted weight); 160.3 – 102.6 = 57.7 (unconverted weight less paper weight).

[2] 160.3 ÷ 57.7 x 19 = 52.7

5

Fifty-seven grams of synthetic cannabinoid equates to 9.5 kilograms of converted drug weight and a starting offense level of 12, an adjustment to the offense level of four points. For this reason, should the Court overrule the defendant's objection to the application of the §2D1.1 cross-reference, a variance as to the converted drug weight is warranted.

   b. **History and Characteristics of Omari Patton**

Omari has spent virtually his entire adult life locked up. When he was arrested in 2002, he was asleep in bed with his son, DaShawn, who was three at the time. He has missed his son's entire childhood – he never saw him play sports, he was not able to teach him how to drive, he could not attend his graduation. And while it is easy to look at the situation and simply say Omari missed his son's life because of his choices, the fact of the matter is, all players in the criminal justice and penal system in this country have evolved to a point where a thirty-year sentence for a first-time drug conspiracy charge is unheard of.

Omari and DaShawn have a strong relationship. Omari has a big, loving family – "a beautiful family" as he likes to describe them. Omari wants to get home to his beautiful family. He does not want to miss another graduation, another wedding, or another funeral.

Omari's father has established a very successful dump truck business. However, Mr. Patton is aging and the operation of the dump trucks – even getting in and out of them – is becoming harder on him with age. When he appeared in Court for Omari's bond hearing, the Court had an opportunity to observe Mr. Patton. While certainly sharp mentally, the physical wear and tear of being a man in his 60s was apparent, walking with a slow, hitched gait. He told the Court how he not only has work available for Omari when he is released, but that Mr. Patton needs Omari home to take an active role in running the successful business Mr. Patton has created. This is a tremendous opportunity and blessing for Omari, but, most importantly, it should give the Court some comfort in knowing that, if entrusted with the return of his freedom, Omari has a lucrative

employment opportunity waiting for him on day one. As the Court certainly knows, one of the biggest hurdles in overcoming recidivism, particularly for defendants attempting reform from drug dealing, is the ability find and maintain a well-paying job. Omari has that opportunity and his father needs him home to help.

Far from the only reason, but likely the most compelling one necessitating a non-custodial sentence, however, is Omari's health. As was discussed at length during the bond hearing, Omari has been diagnosed with pulmonary embolism, deep vein thrombosis and atrial septal defect.

When Omari was indicted in 2019, he was transferred to the "Special Housing Unit," a/k/a "the Hole," to await transfer back to the Western District of Pennsylvania to answer for the charge against him. It was at that time that he lost consciousness and was taken to the emergency room, where he was diagnosed with these conditions: blood clotting disorders and a hole in his heart that was leaking blood into his lungs. Initially, nothing was done about the hole in Omari's heart. He was given twice-daily blood thinners for the clotting disorder.

After being acquitted in March 2022, Omari returned to FCI Fort Dix, at which time the Warden approved his application for release to the halfway house effective June 2022. When he was re-indicted – on the basis of the exact same facts for which the government had investigated him almost *five years prior* – he lost consciousness again while being in the Hole and awaiting transfer. Again, he was taken to the hospital where he underwent open heart surgery to repair the hole in his heart – three and a half years after it was initially discovered.

What occurred next is unthinkably cruel. After a brief recovery in the hospital, Omari was returned to the Hole at Fort Dix to "recover." He was locked in a solitary cell, with just a thin mat on a cold metal-frame bed to recover. He was provided prescribed antibiotics, but had nothing to relieve the pain from an excruciating and invasive surgery. If the government had not re-indicted Omari – charges they absolutely could have brought three years prior – he most certainly would

not have had to endure this experience. He was projected to be released to the halfway house in *June of 2022*, mere weeks after he was indicted triggering the cardiac episode. No one will ever know if he would have eventually needed the surgery had he not been re-indicted, but what is certain is that he would not have faced a recovery in the Hole with a thin mat on a cold metal cot, exchanging pain for vomiting and vomiting for pain. And for what reason? He did not kill anyone. He did not rape a woman. He did not assault a child. Yet he was treated as though he did – treated as a monster – unworthy of any level of dignity, peace or humanity. For this practitioner and above all else, it was this treatment of Omari which catapults this case beyond the realm of offensive.

The conditions which afflict Omari are serious. They can be monitored and they can be treated. But they are very dangerous for someone in prison because, in the event of an emergency, there is no time to spare. A dislodged clot could be a death sentence if not discovered and treated immediately. Even if the BOP had the best of intentions to care for Omari, things happen in prison that put their ability to get him emergency care beyond their control. If a prison riot breaks out, prison staff must be "all hands on deck" to address the situation and movement in the jail would be suspended. If, at that same moment, Omari needed emergency medical attention because of a clot problem, through no fault of their own, the prison would likely be unable to tend to Omari's medical emergency. No matter what anyone thinks of Omari or this case, there must be a consensus that it does not warrant a risk of life.

Additionally, Omari's "aftercare" for these very serious medical conditions has been subpar, at best. He saw not one specialist or outside provider following *open heart surgery* to repair a hole in his heart for nearly a year. It was not until counsel filed for bond for Omari, largely on the basis of these medical conditions, that, miraculously, some attention was given to his aftercare. But, even at that, he has had only one outside appointment in over a year – a "bubble test" a couple weeks prior to this filing. The track record of providing care to Omari is deficient,

to put it mildly. The defense does not have a tremendous amount of faith that much will change if incarceration is continued in a system that will throw a man in solitary confinement to recover from open heart surgery because he has to answer for charges that should have been pursued years prior. For Omari's health and human dignity, the defense believes a non-custodial sentence is appropriate.

**(2) The need for the sentence imposed.**

This factor takes into account a number of sub-factors. In short, the need for the sentence imposed factors into the determination of punishment the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, adequate deterrence to criminal conduct, protection of the public, and providing necessary educational/vocational training and medical care. *See generally* 18 U.S.C. § 3553(a)(2).

Omari has been held by the U.S. Marshals' since January 2019, save for approximately two months when he returned to FCI Fort Dix after being acquitted last March; all told, roughly 52 months. While a portion of this time overlapped with the remainder of his 2002 sentence, there are a few aspects of this period of incarceration that were extraordinary.

Obviously, the time served in jail during the COVID-19 pandemic was abnormally difficult. While prisoners across the country who were incarcerated during COVID also experienced hardship, Omari endured this time at places other than BOP facilities, which lack the same resources and, frankly, concern for the inmates' well-being: specifically, NEOCC and the Allegheny County Jail (hereinafter "ACJ").

The conditions at the ACJ were particularly and notoriously bad. Indeed judges of this court have openly acknowledged that time served at the ACJ during COVID amounted to "hard time." Compounded by staff shortages, inmates at the ACJ were on perpetual lockdown during the pandemic, a functional equivalent to being solitary confinement – no recreation, no visits, no

9

calls, no showers – often for 23 hours a day.  *See* "It Almost Broke Me":  How the Pandemic Strains Mental Health at Pittsburgh's Jail, *The Crime Report*, September 16, 2020.  Making matters worse for Omari was that the COVID-19 inflammatory response increased the risk of clotting disorders, from which he was already suffering.  Omari did get COVID while at NEOCC and lived to tell about it, thankfully, but it does not change the mental stress he endured during the past several years.  The conditions at the ACJ during COVID were more deplorable than usual and, but for the conspiracy case, Omari would not have had to endure the "hard time" he served at both NEOCC and ACJ.  For this reason, he has already suffered extremely serious consequences for the offenses, including offenses of which he was acquitted.

Additionally, the past year of his incarceration has been exacerbated by accusations during the conspiracy trial that he possessed child pornography.  The Court may recall, in its position with respect to sentencing factors, the defense referenced a line of questioning on cross-examination where counsel for the government queried Omari as to whether corrections officers at BOP had searched his cell for his "child pornography collection."  In prison, there is a hierarchy of offenders among the population and being branded as a child abuser or pedophile is the ultimate scarlet letter.  Indeed, sex offenders, particularly crimes involving children, must be housed separately for their own safety.

At sidebar, counsel for the United States explained that the line of questioning was in error, but, be it intentional or not, the damage was done.  "Docket watchers" in jail have access to the transcript from that case and the mere accusation put a target on Omari's back.  This brand will follow him wherever he goes in the prison system and has already caused him hardship over the course of the past year.  While perhaps not intended to be punitive, the effect of counsel's remarks have created a harsh reality for Omari.  By prolonging Omari's time in jail, he remains at risk for retaliation from people who are not interested in dissecting why counsel would have asked such

questions. The defense submits putting Omari's safety and life at risk in this manner amounts to punishment far in excess of what is necessary to achieve the goals of sentencing.

Finally, as indicated, *supra*, there is a tremendous need for Omari to have access to quality and routine medical care given his serious health issues. As important – if not more so – is access to adequate *emergency* care. This particular factor, the need to provide medical treatment, weighs heavily in favor of a non-custodial sentence.

**(3) and (4) The kinds of sentences, the sentencing range and the available sentences.**

The Court has the discretion to impose a non-custodial sentence. The statutory maximum is five years per count. While 18 U.S.C. § 1791(c) requires that any sentence of incarceration imposed be run consecutive to the sentence the defendant was serving at the time of the offense, Judge Ranjan's granting of compassionate release effectively terminated Omari's incarceration sentence for the 2002 case. As such, there is no prison sentence to which the sentence at the instant case would run consecutively. In light of the fact there is no applicable statutory minimum and the Guidelines are advisory, the Court has the discretion to impose a sentence that does not include additional incarceration.

The calculation of the Guidelines is of much dispute between the parties and those legal positions have been presented in various pleadings. The government seeks application of the §2D1.1 cross-reference and the defense objects to it. Under the defense's calculation of the Guidelines, the base offense level is 6 (§2P1.2(a)(3)) and is in Criminal History Category III, resulting in a recommended Guideline range of 2-8 months.

**(5)      Any pertinent policy statement.**

There are no policy statements directly applicable to the offenses of conviction or other sentencing factor. However, it is worth noting that the Sentencing Commission is getting closer each convention to eliminating the ability to use acquitted conduct at sentencing. Although it did

11

not make the "final cut," a "proposed amendment" would have eliminated use of "acquitted conduct" as relevant conduct for purposes of determining the Guidelines calculation unless it was admitted by the defendant as part of the guilty plea colloquy or proven at trial beyond a reasonable doubt. *See* Proposed Amendments to the Sentencing Guidelines, United States Sentencing Commission, February 2, 2023, pgs. 211-214. To this end, should the Court overrule the defense's objections to utilizing the conduct of which Omari was acquitted to determine his sentence, the defense believes a substantial variance from the Guidelines is appropriate in light of the trend towards eliminating this very unfair practice – and this case illustrates precisely why this practice is unjust.

**(6)   The need to avoid unwarranted sentencing disparities.**

Shamar Banks was charged in the conspiracy case and is the person to whom DaShawn Burley sent some of the K2, sometimes via surrogate (Rayshon Gray), while Banks was incarcerated at FCI Ray Brook. Mr. Banks pled guilty to the conspiracy. At the time of sentencing, Mr. Banks was a criminal history category VI. *See* ECF 2:19-cr-8, Doc. 3695. At criminal history category VI – the most severe criminal history category afforded by the Guidelines – and a stipulated offense level of 12, Mr. Banks' recommended Guideline range was 30-37 months imprisonment. The Court varied down to a sentence of 21 months' imprisonment.

Co-defendant DaShawn Burley, by contrast, had no criminal history. He was acquitted at trial on the conspiracy case. He was reindicted on the contraband case in May 2022, as well. Mr. Burley pled guilty in exchange for a stipulation from the government as to the applicable Guidelines' range. His offense level was 6, less two points for acceptance of responsibility, resulting in a recommended Guidelines' range of 0-6 months. Omari hopes and anticipates that DaShawn will receive a sentence of probation.

This section of the Memorandum could involve pages upon pages of comparisons, but the essence of these two cases really illustrates the unwarranted and unjustified disparity between similarly situated defendants – indeed, ***the*** co-defendants. At a criminal history category VI, Mr. Banks must have a substantial criminal history. Yet the Court, and apparently the government, as well, was satisfied with a Guidelines' offense level of 12 and a recommended sentencing range of 30-37 months and the Court varied down even lower. To impose on Omari a non-custodial sentence would be just relative to Mr. Banks. A sentence in the 63-78 months' imprisonment range, on the other hand, would be drastically disparate to Mr. Banks' case.

Mr. Burley has the opposite history from that of Mr. Banks, but he was the cog in the wheel as to the attempts to obtain and provide contraband. He was the one on the outside who had the means to transmit the packages. Omari is grateful that the government agreed not to apply §2D1.1 cross-reference to his son's Guidelines' calculation. But with the two of them being only two criminal history categories apart, and having been co-actors in the effort to provide and obtain K2, there can be no accounting for a disparity of 5 to 6½ years in prison, other than their differences in choosing how to plead. The defense's position on this disparity was articulated at great length in its position with respect to sentencing factors, but, suffice it to say, as to Mr. Burley's case, a non-custodial sentence for Omari would be consistent, rather than disparate, whereas a sentence within the Guidelines' range purported by the United States and Presentence Report would be unjustly incongruent.

## **CONCLUSION**

The time has come for Omari Patton to put on a pair of blue jeans, to order a pizza, to jump in a swimming pool, to hug his son, to help his father, to pet a dog, to get his license, to drive a car, and to fall asleep in his own bed. It has been over two decades – two decades of clanging

metal doors, jingling keys, inmate riots, terrible food, lousy medical care, unrelenting scrutiny and general mental stress and exhaustion. He has paid his debt to society and beyond.

It is time for Omari to have the chance to honor the freedom with which the Court will entrust him if given the opportunity to finally return home. It is time for Omari to prove all the naysayers wrong.

It has been twenty-one very long years. It is time.

Respectfully submitted,

_____
Meagan F. Temple, Esq.
PA ID #92084

250 Mt. Lebanon Blvd.
Suite 207
Pittsburgh, PA  15234
Tel.:  (412) 571-6206
Fax:  (412) 571-6209
Email:  mtemple@temple-frayer.com